## TOBIN v. GRANT et al.
### No. 27148.

United States District Court
N. D. California, S. D.
Sept. 30, 1948.

William S. Tyson, Sol., John J. Babe, Asst. Sol., and Herman Marx, Regional Atty., all of Washington, D. C., and Tobias D. Casey, Atty., United States Department of Labor, of San Francisco, Cal., for plaintiff.

Morgan J. Doyle and J. Joseph Sullivan, both of San Francisco, Cal., for defendants.

HARRIS, District Judge.

Plaintiff, Secretary of Labor, seeks to enjoin defendants from violating the child labor provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Plaintiff alleges that defendants are violating Section 212 of the Act:

"* * * no producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed * * *"

Defendants have been engaged in the business of manufacturing books and book covers since April, 1943. Their business is

conducted under the trade name of "The Ardes Company" in a two story building in San Francisco. The manufacturing operations are spread throughout the building, in which machines are used for the production of books. The principal items manufactured are bank, check and union membership books. Much of their production consists of book covers only.

They manufacture books on order. Customers include banks, printing concerns and other book manufacturers. Defendants send the completed product from their plant to their customers.

During the period covered by the complaint defendants made three shipments to customers located in other states. The balance of their shipments and deliveries were made to customers located in California. Defendants did a gross business during the period of the complaint approximating $200,000. The direct shipments total less than a thousand dollars.

Defendants usually emboss or stamp on the book covers the name and location of the organization for whose use the covers are designed. During the period involved, approximately 7% of their income was derived from the manufacture of books and covers upon which they placed names and locations of organizations located outside of the State of California. Defendants have stipulated that the data placed on the covers indicated to them that the goods were designed for use outside the state of manufacture by their customers or others and were intended for out-of-state destination.[1] Books and covers for use outside of the state were produced and delivered with recurrent frequency. Such goods were subsequently shipped by their customers to the respective organizations whose names appeared on the covers.

Between April, 1943, and March, 1947, defendants employed a total of twenty-two minors under the age of sixteen years in processing or manufacturing occupations or in workrooms where goods were manufactured or processed. The youngest child employed was eleven years old. All of the children were employed in the plant within 30 days immediately preceding the delivery by the defendants from their establishment of goods produced therein and designed for use in other states and subsequently shipped out of the state by their customers or others.

It is defendants' position that their business is not covered by the Act because they neither "shipped nor delivered for shipment in commerce" any goods within the meaning of Section 212 of the Act. With respect to the admitted interstate shipments, they contend that these were so sporadic and inconsequential as to make applicable the rule of "de minimis non curat lex."

Defendants' direct interstate operations have represented less than one-third of one percent of their business and have occurred as isolated transactions. Such shipments, by themselves, are not the basis for finding that they were engaged in interstate commerce. Hooks v. Nashville Breeko Block & Tile Co., D.C., 39 F.Supp. 369; Gerdert v. Certified Poultry & Egg Co., D.C., 38 F.Supp. 964; Goldberg v. Worman, D.C., 37 F.Supp. 778.

The problem presented by the shipments which were known to be scheduled for interstate commerce by the purchaser, but in which title passed within the state of manufacture, is more complex. Defendants knew that 7% of their output, embossed with legends such as "Bank of America N. T. & S. A., Manila, Philippine Islands," "The Bank of Guam, Agana, Guam," or "United Fishermen of Alaska," was intended for shipment outside the State of California. Such percentage of transactions involved in interstate commerce is sufficiently large, in view of the nature of their business to place them within the regulatory powers of Congress. Wagner v. American Service Company, D.C., 58 F.Supp. 32; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83.

Defendants argue that knowledge of the ultimate destination of their product

---

[1] "It does appear that these books are intended for use at points outside the State of California." (Tr. p. 7, 1. 19, et seq.)

is immaterial. They claim that the manner of consummating their sales, with title passing to an intrastate purchaser is controlling.

When title passed is entirely irrelevant. Santa Cruz Fruit Packing Company v. N. L. R. B., 303 U.S. 453, at page 463, 58 S.Ct. 656, 82 L.Ed. 954; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; N. L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L. Ed. 1014; United States v. Darby, supra; Enterprise Box Company v. Fleming, 5 Cir., 125 F.2d 897; Wagner v. American Service Company, supra. Rather, the court must ascertain whether articles were delivered in California for shipment in interstate commerce. Patently, they were— as their ultimate destination was made manifest from the clear imprint on the articles.

Defendants have assumed to place some significance in the fact that the articles were not delivered to a carrier and argue, therefore, that the manufactured products were not delivered for shipment. Delivery to a carrier is not the test. Hamlet Ice Company v. Fleming, 4 Cir., 127 F.2d 165; Atlantic Company v. Walling, 5 Cir., 131 F.2d 518; Walling v. Peoples Packing Company, 10 Cir., 132 F.2d 236.

Plaintiff, in support of its position that defendants' shipments come within the scope of the language of the Fair Labor Standards Act of 1938, Section 212, supra, which forbids a manufacturer to "deliver for shipment in commerce," has prepared a detailed history of the legislation.

A study of the Act, as drafted and debated by Congress, will disclose that it was the manifest intention of the authorities to eliminate child labor in a manufacturing plant such as defendants'. The objective was set forth in plain language in the Black-Connery Bill as originally introduced (S. 2475, 81 Cong.Rec. 7750); in the Bill reported by the Senate Committee (81 Cong.Rec. 7596); in the Wheeler-Johnson

amendments (S. 2226) incorporated in the Bill passed by the Senate (81 Cong.Rec. 7949–51); in the Bill as reported by the House Committee on Labor (81 Cong.Rec. 8478); and in the Bill when it was recommitted by the House to the Committee on Labor. Specific language appropriate to that objective was consistently retained in every form in which the Black-Connery Bill had been considered by Congress or its committees until the second report by the House Committee (H.R.Rept. 2182, 83 Cong.Rec. 5680) and the passage by the House of the Bill reported by its committee the second time. It was only in the final stages of the legislation that Congress decided to use language similar to that of the Child Labor Act of 1916, 39 Stat. 675, to effect the prohibition of child labor.

When Congress used a different mode of expression from that previously considered in drafting the child labor prohibitions, it did so because of its desire to test the prohibitions which had been declared unconstitutional in the case of Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724. These provisions were reenacted, in substance, in Section 212 of the Fair Labor Standards Act. In order to assure severability of the provisions dealing with wage and hour regulations, Congress adopted the language of Section 7 of the Black-Connery Bill to prohibit the interstate movement of goods produced in violation of the statute's wage and hour provisions (now Section 215(a) (1) of the Act),[2] and placed the child labor prohibitions in the present Section 212(a) of the Act.

The difference in phraseology between the wage and hour section and the child labor section of the Fair Labor Standards Act is not significant in the light of the history and purpose of the Act. It is believed that the words "deliver for shipment in commerce" are sufficiently broad to cover a situation in which a manu-

[2] "(a)  *  *  *  it shall be unlawful for any person—(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206, or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title; *  *  *"  29 U.S.C.A. 215.

facturer, knowing that the ultimate destination of his goods is in interstate commerce, sells to a concern which makes the actual shipment. If the Act did not cover such a transaction, manufacturers could violate the law with impunity by selling goods within the state of manufacture, regardless of the known interstate market. Just as "[selling] with knowledge that shipment or delivery or sale thereof in commerce is intended" constitutes a violation of the wages and hours provision of the Act, so such a sale also constitutes a violation of the child labor provision which forbids "[delivery] for shipment in commerce" of goods manufactured in violation of the law.[3]

Accordingly, it is ordered that defendants be and they hereby are enjoined from making further shipments and deliveries of goods in commerce manufactured in violation of Section 212(a) of the Fair Labor Standards Act.

Decree may be entered accordingly.

---

[3] See Richfield Oil Corporation v. State Board of Equalization, 329 U.S. 69, at page 84, 67 S.Ct. 156, 164, 91 L.Ed. 80. The Supreme Court, in construing the application of constitutional prohibitions against state taxes on exports, used as a test for determining whether a California sales tax constituted a violation, "its operation and effect" on the particular shipment, rather than the characterization which the state had given the tax. By the same token, in the instant case it is vital to a proper construction of Section 212 of the Fair Labor Standards Act to analyze each transaction, to determine its operation and effect in the light of the prohibitions of the Act.